UNITED STATES DISTICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| NICOLE M. BURDETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1:18-CV-00418-HAB |
| | ) |
| UNITED PARCEL SERVICE, INC. | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

United Parcel Service, Inc. (UPS) refused Plaintiff Nicole Burdett's (Burdett) request to accommodate her disability by restructuring her sales territory and instead placed her in a six-month job search to find her substitute employment within her medical restrictions. What it did not do was engage in the interactive process to determine whether an accommodation existed that permitted Burdett to perform the essential functions of her position as a senior account executive. While the six-month job search was underway, Burdett's physician declared her unable to work at all and Burdett requested to be administratively separated from UPS. She then sued for disability and sex discrimination. Now before the Court is UPS's Motion for Summary Judgment, (ECF No. 66), in which UPS asserts that Burdett cannot sustain her claims. Burdett responded in opposition to the motion (ECF No. 71), to which UPS replied. (ECF No. 77). Because the Court finds that genuine issues of material fact exist as to whether UPS failed to accommodate her disability, that claim survives. Her remaining claims of disparate treatment under the ADA and sex discrimination succumb to summary judgment as does her request for punitive damages.

**FACTUAL BACKGROUND**

Burdett was a long-time employee of UPS, having begun her work in 2002 as a part-time supervisor at the UPS facility at the Fort Wayne International Airport in Fort Wayne, Indiana. Throughout the years, she received a series of promotions resulting in her placement as a Senior Account Executive (SAE) at the time of these events. Burdett reported to Area Sales Manager Lee Stevens (Stevens). As an SAE, Burdett's duties included "mak[ing] visits to large-spend customers with UPS in a geographic area, manag[ing] the relationship with the building and the drivers." (Burdett Dep. at 37, ECF No. 72-1). Burdett's specific job description for the SAE position listed the essential functions as bending, lifting/carrying, stooping/squatting, crouching/kneeling, climbing stairs, walking intermittently throughout the day, and travelling by car or plane. To visit customers, Burdett often drove more than 30-45 minutes and routinely had to walk more than 5,000 steps per day. (*Id.* at 38).

Burdett's last work date at UPS was June 27, 2016. The next day, Burdett underwent surgery on her right knee and remained on medical leave afterward. (Burdett Dep. at 60). Three weeks later Burdett underwent a second surgery to repair damage she sustained to her surgically repaired knee during a fall. From late June to mid-December 2016, Burdett received short-term disability benefits. When those benefits expired, Burdett began collecting long-term disability.

As implemented through its Human Resources Service Center (HRSC), UPS maintains a policy and procedure for employees to request a reasonable accommodation under the ADA (the Policy). (ECF No. 72-7). Under the Policy, an employee must seek an accommodation by requesting one from the HRSC. The HRSC then provides a packet of forms to the employee to be completed by both the employee and the employee's treating provider. Once the provider sends the completed paperwork to HRSC, UPS schedules an ADA checklist meeting to review the employee's request, determine the employee's restrictions, and identify possible accommodations.

(David Eng Dep. at 15-17, ECF No. 68-3). If UPS cannot identify a suitable and available accommodation within the employee's restrictions, the employee is placed into a "six-month job search." (*Id.* at 18). But the Policy does provide that "UPS will always look at your current position first in order to see whether you can be accommodated and still perform the essential functions of your job." (ECF No. 72-7 at 2). Additionally, under the Policy when an employee has exhausted a 12-month leave of absence and is placed in the six-month ADA search period, that employee remains an active employee in UPS's system. However, the employee's benefits are typically inactive during that time.

On April 12, 2017, Burdett requested a job-related accommodation from UPS. (Burdett Dep. at 66). Her treating physician submitted the medical questionnaire provided by HRSC and identified her medical condition as "right knee primary osteoarthritis." It also listed these restrictions: no standing for long periods, no squatting, no walking more than 5,000 steps, no kneeling, no driving more than 45 minutes, and no carrying or lifting. (*Id.* at 70 and Exs. 25 and 26 to it).

Burdett's ADA request was assigned to Area Human Resources Manager, Dave Eng (Eng). On May 12, 2017, Eng conducted the ADA checklist meeting with Burdett.[1] Burdett completed parts of an accommodation checklist identifying her restrictions, including: walking more than 5,000 steps per day; traveling more than 45 minutes at a time; kneeling, squatting, lifting, or carrying more than a computer to and from customer locations; and standing for more than 30-40 minutes. (Burdett Dep. at 73-75 and Exh. 28). During that meeting, Burdett requested an adjusted territory of only Fort Wayne or Allen County as an accommodation. Before going on leave,

---

[1] HRSC Occupational Health Supervisor, Jurgen Rosner, also attended the meeting telephonically. He does not appear to be a material witness to the events relating to this suit as he is only mentioned once as a participant.

3

Burdett's territory included Fort Wayne (in Allen County) and Steuben, DeKalb, LaGrange, and Noble Counties. Burdett also requested a reduction in customer visits per day to three from the five or six visits she had made. If these accommodations could not be made, Burdett identified alternative positions she believed she could perform that were within her restrictions, including business development CPM analyst, finance analyst, and HR. (*Id.* at 77 and Exh. 28; Eng Dep. at 21-23).

After the ADA checklist meeting, Eng consulted Burdett's area manager, Stevens. Stevens advised Eng that an adjustment to Burdett's territory could impact the bonus pay of other SAE's on Burdett's team. (Eng Dep. at 23-24). As explained by Stevens, members on Burdett's sales team are paid bonuses based on customer performance and if another member inherited Burdett's territory and that territory included a customer performing poorly, that member's bonus pay would be undercut. (Stevens Dep. at 13-15, ECF No. 68-2). Stevens believed that a reduction of Burdett's territory would unfairly burden other members of her team with larger territories. This view was echoed by Daniel Minesinger (Minesinger), Regional HR Operations Manager and member of the regional ADA committee, who had concerns about reducing Burdett's visits when other sales representatives were doing twice that amount. As Eng explained it:

> I spoke to Lee [Stevens]. He indicated to me that it wasn't a specific number of required visits per day, that it could range and vary based on the area, the territory. So there was some hesitation both in that group and with Mr. Minesinger and the committee that locking a person into a certain number of visits could be detrimental to the job and/or the role that job plays for the company because there wasn't a set number of visits, so there could be 12 required in a day or not required, but there could be 12 that – you know, customers that were asking for some attention. There could be one. So to lock in a certain number of visits could be actually detrimental to both the employee and the company if the employee just didn't have customers asking for support that particular day. At least that was my understanding of those conversations.

4

(Eng Dep. at 35-36). As for the alternative positions Burdett suggested, none of those positions were available and thus Eng did not assess whether Burdett was qualified to perform the essential functions of those positions. No positions other than the ones suggested by Burdett were discussed at the meeting.

UPS's regional ADA committee[2] makes recommendations and determines whether an employee's request for accommodation is approved or denied. (Eng Dep. at 26). In Burdett's case, the committee declined Burdett's requested accommodation and decided to place her into the six-month job search. There is no evidence that UPS engaged with Burdett, as its Policy encourages, to determine whether any other accommodations would permit Burdett to continue in her SAE position. For instance, Burdett believes she could have kept her existing territories if she could take a break after driving 45 minutes. Stevens testified that SAE's set their own schedules and have no minimum or maximum number of required customer visits. (Stevens Dep. at 19). Thus, if Burdett had to take driving breaks it may have lengthened her day or the time between visits, but she could have accommodated that by adjustments to her own schedule. (*Id*. at 18).

On July 7, 2017, UPS advised Burdett of its decision by letter, noting in the letter that there were no available positions for which Burdett qualified, but that it would continue to look for an available position for up to six months. (Burdett Dep. at 98 and Ex. 31). Under the Policy, once Burdett was placed into the six-month job search, Burdett's benefits were to be stopped. Eng, however, testified that because Burdett was a longstanding employee in good standing and UPS was looking for an available position for her, he requested that her benefits remain active during the six-month search period. This request was granted.

---

[2] The Regional ADA committee consists of the Regional HR Operations Manager, who at the time of Burdett's request was Minesinger, an individual from UPS's legal department and a member of outside counsel. (Eng Dep. at 26).

Sometime during the six-month period, an Operations Specialist position became available. Eng reviewed the position with his supervisor and the two agreed that the position would not match Burdett's restrictions as the position required "a lot of walking, up and down stairs, in and out of package cars" and required her to be on the dock, bending and lifting. (Eng Dep. at 79). Burdett concedes she could not perform the essential functions of this position with or without an accommodation. (Burdett Dep. at 166).

In December 2017, UPS offered Burdett a part-time position as an Industrial Engineering Air Supervisor. Burdett rejected the position because the position would have led to a lower annual income and she would have been working the graveyard shift. Burdett also believed that accepting the part-time position would cause her to lose her medical benefits. Eng, however, testified that the position would have permitted Burdett to maintain her medical coverage and other benefits.

On December 18, 2017, Burdett's physician determined that she could no longer work. (Burdett Dep. at 21). Burdett then requested that UPS withdraw her accommodation request. (*Id.* at Ex. 36). UPS notified her that if she withdrew her accommodation request, she would be administratively separated. An administrative separation is a ministerial function and is not considered a termination. In accordance with her request, effective January 5, 2018, Burdett was administratively separated from UPS.

Burdett identified four male employees she believes were treated more favorably than UPS treated her. Jason Herman, an SAE, had both of his achilles tendons repaired and continued working during his recovery while he could not drive or walk. Thomas Reamer, a Business Manager with a brain aneurysm, transferred to a smaller facility so he could supervise fewer employees. Burdett contends Ron Huff was provided a secondary person as an accommodation after he returned from stress leave. Finally, Bob Tomlinson was a Driver Supervisor placed in an

6

alternative position for six months following his knee surgeries. In response to these comparators, UPS notes that Herman never requested an ADA accommodation and the remaining individuals held different positions, in different departments and reported to different supervisors.

## APPLICABLE STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

## **<u>DISCUSSION</u>**

A. <u>**ADA Discrimination Claims**</u>

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The ADA then defines 'discriminate against a qualified individual on the basis of disability' to include disparate treatment and failure to accommodate: 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee.'" *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (emphasis omitted)(quoting 42 U.S.C. § 12112(b)(5)(A)). Burdette asserts both types of discrimination under the ADA.[3]

1. *Failure to Accommodate*

"A claim for failure to accommodate under the ADA ... requires proof [that] (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of h[er] disability; and (3) defendant failed to accommodate h[er] disability reasonably." *Scheidler*, 914 F.3d at 541 (emphasis omitted). At issue are the first and third elements.

Under the ADA, a "qualified individual with a disability" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The employee must "pass a two-step test" to be a "qualified individual." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). "First, the individual must satisfy 'the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, *etc.*'" *Id.* "Second, the individual must be able to 'perform the essential functions of the

---

[3] Burdett also asserted a retaliation claim under the ADA in her Complaint but has withdrawn that claim. (ECF No. 71 at p. 9, n. 2).

position held or desired, with or without reasonable accommodation.'" *Id.* "[Courts] presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010) (citing *Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001)). The plaintiff bears the burden of proof to establish that she is a qualified individual. *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. 1996); *Miller v. Ill. Dep't of Corrs.*, 107 F.3d 484, 484 (7th Cir. 1997).

UPS asserts that Burdett's discrimination claims fail because she cannot meet the requirement that she was a "qualified individual" who could perform the essential functions of the SAE position with or without a reasonable accommodation. Burdett does not dispute this, at least in part. By her own testimony she acknowledges she could not perform the essential functions of the SAE position without an accommodation – hence, the reason she sought an adjusted territory and fewer customer visits as an accommodation. UPS, in turn, contends that job restructuring under the circumstances presented in this case, namely that the requested accommodation would unfairly burden Burdett's coworkers, is not a reasonable accommodation.

The ADA does not require an employer to provide the exact accommodation that an employee requests. *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005). Rather, it is the employer's prerogative to choose a reasonable accommodation. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir.2000) ("It is well established that an employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer."); *McCreary v Libbey–Owens–Ford Co.*, 132 F.3d 1159, 1165 (7th Cir.1997); *Weiler*, 101 F.3d at 526; *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996); *Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 344 (7th Cir. 1996).

UPS declined to restructure Burdett's territory because, according to Stevens and Minesinger, to do so would burden other SAE's with Burdett's responsibilities and significantly reduce her workload. It had the possibility of negatively affecting the pay structure of the employees that would inherit Burdett's other territories.

In response, Burdett acknowledges that when asked to describe the accommodations she felt would permit her to perform the essential functions of her SAE position, she identified two – territory restructuring and reduced customer visits. She emphasizes that the only functions that caused concern were traveling by car and walking extended distances. While her restrictions included not driving more than 45 minutes, she asserts that if she had been accommodated with a break during her driving, she could have serviced all the counties in her territory and remained in her SAE position. Finally, she points to Stevens' depositions where he noted that SAE's make their own schedules, determine which places they visit each day, and determine which customers to call on. (Stevens Dep. at 18-19). Thus, she argues that if she had been permitted to make scheduling adjustments she could have remained in her position.

Courts have specifically addressed situations in which an employee's requested accommodation increases the workload of other employees or requires the employer to hire additional employees to perform the work previously performed by a single employee. *See Gratzl*, 601 F.3d at 680 ("An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee."); *Rivera v. Principi*, 2001 WL 1249051, at *7 (N.D. Ill. Oct. 16, 2001) ("[T]he VA . . . was not required to restructure Rivera's position or the position of other employees in order to accommodate his disability."); see also *Lewis v. Gibson*, 621 Fed.Appx. 163, 165 (4th Cir. 2015) (per curiam) (citing cases) ("an accommodation that would require other employees to work harder is unreasonable."); *Fiorillo v. United Techs. Corp.,* 2016

10

WL 1118789, at *15 (D. Conn. Mar. 21, 2016) (holding summary judgment was appropriate and noting that "restructuring an existing job may be a reasonable accommodation, [but] an employer is not obligated to hire additional employees or have multiple employees perform the work normally performed by a single employee in order to satisfy its obligations under the ADA").

Under the above authorities, Burdett's request for a restructured workload which involved the corresponding transfer of her territories to others was not reasonable. Although a reasonable accommodation may include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position," removing essential functions from a position is "*per se* unreasonable." 42 U.S.C. § 12111 (9)(B); *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015); *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) ("A suggested accommodation is not reasonable if it requires eliminating an 'essential' function of the job."); *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000) ("the ADA does not require employers to accommodate individuals by shifting an essential job function onto others.").

One of the essential job functions for the SAE position was to "travel extensively by car or plane to call on customers and visit non-UPS locations." (ECF No. 68-1 at 50). By her own admission, Burdett was restricted to travel less than 45 minutes by car (without a break), an amount of time that on its face would exclude her from calling on customers in several counties within her territory. Because adjusting Burdett's territory by removing those counties would shift some of her essential job functions onto others, UPS acted within its rights by not accommodating Burdett in that way.

But that is only part of the analysis. The ADA requires that the employer and employee engage in an interactive process to determine a reasonable accommodation. *Sears,* 417 F.3d at

797. Burdett says that only partially happened here. (ECF No. 71: "[T]here was no discussion about what she was in fact able to do, only what she could not do, and even when she discussed her limitations, there was no discussion about how her position could be adjusted to accommodate her."). And while a failure to engage in the interactive process is not an independent basis for liability, it is actionable when it "prevents identification of an appropriate accommodation." *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 972 (7th Cir. 2020) (quoting *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014)). It is only "when a reasonable accommodation was possible and the employer did not offer it, [that] the third element of a 'failure to accommodate' claim turns on the 'interactive process' requirement. In that event, 'responsibility will lie with the party that caused the breakdown." *Sears,* 417 F.3d at 805.

The record before the Court shows that UPS could have done more to collaborate with Burdett to find an accommodation. For instance, UPS has not explained why Burdett's drive time could not be altered by allowing her to take a short break when required so that she could keep working. And no one at UPS, after rejecting her requested accommodations, prompted Burdett about whether other reasonable accommodations short of restructuring her territory would have allowed her to return to her SAE job. This is true even though UPS's own Policy dictates that it will "always look to [an employee's] current position first."

In its reply, UPS discusses the "real-world problems associated with asking UPS to permit Plaintiff to administer her own accommodation on an *ad hoc* basis." (ECF No. 77 at n. 3). In essence, UPS argues that allowing Burdett to formulate her own schedule which it sees as "a nebulous arrangement" was unworkable. But on this record, this accommodation was never considered or discussed as part of the interactive process. From the record, it appears UPS had one

12

meeting with Burdett, she proposed an accommodation, UPS rejected it later, and no other attempts were made to accommodate her in her own position.

Once made aware of the need for accommodation, "an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance." *Sears*, 417 F.3d at 804. Rather, the employer has an "affirmative obligation to seek the employee out and work with her to craft a reasonable accommodation." *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 638 (7th Cir. 2020) (quoting *Sears*, 417 F.3d at 807). Moving forward, "the employer and the employee must work together through an 'interactive process' to determine the extent of the disability and what accommodations are appropriate and available." *Sears*, 417 F.3d at 804. Each party must set forth a "'good faith effort' to determine what accommodations are necessary." *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)). If the process breaks down, "courts should attempt to isolate the cause...and then assign responsibility." *Id.*

Burdett has raised a genuine issue of fact on whether a reasonable accommodation existed which could have permitted her to remain in her position as an SAE, albeit only through December 2017 when her doctor found her unable to work. UPS was under a continuing obligation to engage with Burdett and determine whether an accommodation existed that would enable her to perform the essential functions of her position. It did not do so. For this reason, whether Burdett is a qualified individual with a disability is a question for the jury. UPS's Motion for Summary Judgment is DENIED as to Burdett's ADA failure to accommodate claim.

2. **Disparate Treatment**

A claim for disparate treatment under the ADA "requires proof that: (1) the plaintiff was disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without

reasonable accommodation; and (3) disability was the 'but for' cause of the adverse employment action." *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020) (citing *Scheidler*, 914 F.3d at 541. A plaintiff asserting a discrimination claim under the ADA may proceed under the approach outlined by the Seventh Circuit Court of Appeals in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016), where the question is "'whether the evidence [considered as a whole] would permit a reasonable factfinder to conclude'" that Burdette suffered an adverse action due to her disability. *Castetter*, 953 F.3d at 996 (quoting *Ortiz*, 834 F.3d at 765). *Ortiz* dispensed with the old "direct- and indirect-framework" as it relates to the "proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect.'" 834 F.3d at 766. To show that discrimination was the "but for" cause of an adverse employment action, a plaintiff can point to direct evidence, such as an admission, or to circumstantial evidence, which includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson v. Bd. of Trustees of Comm. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

The Seventh Circuit, however, has not entirely done away with separate tests or methods to analyze discrimination cases, and it has stated that "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *see also McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019). Under the *McDonnell Douglas* framework, a plaintiff must show that "(1) [s]he is disabled under the ADA; (2) [s]he was meeting h[er] employer's legitimate employment

expectations; (3) [s]he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably." *Dickerson*, 657 F.3d at 601. "Once a plaintiff has established a *prima facie* case, the defendant must identify a legitimate non-discriminatory reason for its employment decision. If the defendant satisfies this requirement, the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Id.* (citation omitted).

The parties spend much of their briefing discussing various elements of the burden shifting framework, specifically whether Burdett suffered an adverse employment action and whether similarly situated others were treated more favorably. On the first issue, Burdett asserts that the failure to accommodate her led to a loss in pay and benefits and thus, she has sufficiently articulated an adverse employment action. But this argument is a mere recategorizing of her failure to accommodate claim. UPS focuses on her separation from employment and asserts that she requested to be voluntarily separated and thus, no action was taken against her by UPS. As for similarly situated others, although Burdett argues that other disabled employees were treated more favorably, she is hard-pressed to prevail on that point since none of the comparators she lists requested an accommodation from UPS.

On the record before the Court, even assuming the Court resolved the above elements favorably to Burdett, no reasonable juror could conclude under either evidentiary framework that discriminatory animus or Burdett's disability was the "but for" reason UPS failed to accommodate her or that her separation was driven by discriminatory intent. There is nothing in the record to suggest that UPS did not honestly believe that it did not have to restructure her position. There is no evidence that UPS opted not to accommodate her because of disability discrimination. Rather, the facts show that UPS, while falling short in the interactive process, considered her requested

accommodation, had a non-discriminatory reason to deny that request, and attempted to find Burdett a substitute position at UPS. As for her separation, the undisputed facts are that in December 2017 Burdett's physician found her unable to work, she withdrew her request for accommodation, and asked to be administratively separated from UPS. No act by UPS caused her separation and thus no jury could infer that impermissible discrimination was the "real" reason she left UPS's employ. For these reasons, summary judgment is GRANTED as to her disparate treatment claim.

### B. Title VII - Sex Discrimination

Burdett also asserts sex discrimination under Title VII of the Civil Rights Act of 1964. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). At summary judgment, the question is "whether the evidence would permit a reasonable fact-finder to conclude that [the plaintiff] was subjected to an adverse employment action based on a statutorily prohibited factor." *McCurry v. Kenco Logistics Serv., LLC*, 942 F.3d 783, 788 (7th Cir. 2019).

Although she has raised a sex discrimination claim in her Complaint, the claim is largely unexplored by Burdett in the briefing, save two paragraphs arguing that male disabled employees were treated more favorably by UPS when they were accommodated for their disabilities. (ECF

16

No. 71 at 18-19).[4] Plaintiff fails altogether to discuss the two distinct evidentiary frameworks governing the analysis here (see above discussion) nor does she develop her arguments in any meaningful way for the Court to consider. This failure invites the question of whether Burdett can be said to have waived her claim for sex discrimination. *See De v. City of Chi.*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of [her] claims."). This potential notwithstanding, the Court will briefly address the claim.

The two evidentiary frameworks for a claim under Title VII are nearly identical to those for her disparate treatment claim under the ADA. To that end, if Burdett is trying to rely on the burden-shifting *McDonnell Douglas* methodology, she must show that "(1)[s]he belongs to a protected class; (2)[s]he met h[er] employer's legitimate expectations; (3) [s]he suffered an adverse employment action; and (4) another similarly situated employee outside of h[er] protected class received better treatment from h[er] employer." *Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 957 (7th Cir. 2021) (applying *McDonnell Douglas* framework to Title VII employment discrimination claims) "Once a plaintiff has established a *prima facie* case, the defendant must identify a legitimate non-discriminatory reason for its employment decision. If the defendant satisfies this requirement, the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Id.* (citation omitted).

Burdett's argument addresses only the fourth prong of the prima facie case, that is that similarly situated male employees were treated more favorably. To that end she argues that "when her male counterparts had illnesses that impacted their ability to perform their job, they were

---

[4] The Court questions whether, in substance, this claim is distinct from a disparate treatment ADA claim but will address the claim as it has been presented.

accommodated." (ECF No. 71 at 18). She then identifies four male employees that UPS allegedly accommodated, all the while acknowledging that three of these employees work in different departments than Burdett, perform different jobs than Burdett, and report to different supervisors. (*Id.* at 19). Under Seventh Circuit precedent, these three individuals are not similarly situated. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014) (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000) ("an employee is similarly situated only where he is directly comparable in all material aspects.").

This leaves only one individual, Jason Hermann, that Burdett purports to be similarly situated to her and was allegedly accommodated. Hermann was in the SAE position, could not drive or walk without crutches for a period of six to eight weeks, and reported to the same supervisor as Burdett. Burdett asserts, and UPS does not deny, that Hermann remained in his SAE position during his recovery. So far so good for Burdett. But, as UPS points out, this is where the similarity ends. Hermann never requested an ADA accommodation from UPS and his restrictions were temporary, unlike Burdett's, which were permanent.[5] Thus, UPS asserts, and the Court agrees, that he is not a viable comparator for Burdett.

But even if the Court gives Burdett the benefit of the doubt here, she has altogether failed to rebut the legitimate, nondiscriminatory reason offered by UPS for why her request for an accommodation was denied. The record establishes that UPS believed her request for a reduced territory would unfairly burden her co-workers. She has presented nothing to suggest that the request was denied as a pretext for sex discrimination or that her sex was even considered in the decision-making process. Thus, under the *McDonnellI-Douglas* analysis, she has failed to support an inference of sex discrimination.

---

[5] Burdett is hard-pressed to argue that her restrictions were not permanent ones, especially when her physician found her unable to work in December 2017.

Outside the *McDonnell-Douglas* framework, Burdett fares no better under *Ortiz*. When using this approach, courts ask only "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki*, 988 F.3d at 958 (citing *Ortiz*, 834 F.3d at 765). On the record here, Burdett's sex discrimination claim cannot survive summary judgment because she points to no reasonable inferences from the totality of the evidence which would lead a juror to conclude that UPS discriminated against Burdett on the basis of sex. Summary judgment is GRANTED.

### C. Punitive Damages

UPS also seeks summary judgment on Burdett's claim for punitive damages. Punitive damages can be awarded to a plaintiff in an ADA case if it is shown that the defendant "engaged in intentional discrimination 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529–30 (1999) (quoting 42 U.S.C. § 1981a(b)(1)); see also *Gile*, 213 F.3d at 375 (7th Cir. 2000) ("The district court may award punitive damages in connection with an ADA claim when the defendant engaged in a 'discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual.'" (quoting 42 U.S.C. § 1981a(b)(1). The designated evidence must demonstrate that the defendant has engaged in some "egregious" misconduct. *Kolstad,* 527 U.S. at 534. In other words, it must be established that UPS was "motivated by evil motive or intent, or ... involve[d] reckless or callous indifference to the federally protected rights of others." *Id.* at 536.

Mindful that the goal of punitive damages in this context is to penalize employers for "well-understood violations of the ADA and other discrimination laws" *Equal Emp. Opportunity Comm'n v. Flambeau, Inc.,* 846 F.3d 941, 947 (7th Cir. 2017), the record in this case does not raise

19

a genuine issue of fact as to malice or reckless indifference to Burdett's federally protected rights sufficient to support a claim for punitive damages. The evidence supports the conclusion that UPS honestly believed it had no obligation to accommodate Burdett through job restructuring. While the Court has found that the interactive process could have been improved, UPS certainly made good faith efforts to comply with both its own policy and the ADA. *See Kolstad*, 527 U.S. at 544-46. That is sufficient to insulate UPS from punitive damages. Summary judgment is GRANTED as to Burdett's request for punitive damages.

## CONCLUSION

Based on the above, UPS's Motion for Summary Judgment is DENIED (ECF No. 66) as to Burdett's failure to accommodate claim under the ADA; it is GRANTED as to all remaining claims.

SO ORDERED on November 3, 2021.

        s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT